No. 11 March 2, 2017 115

IN THE SUPREME COURT OF THE
STATE OF OREGON

Christopher S. BARRETT,
*Plaintiff-Adverse Party,*

*v.*

UNION PACIFIC RAILROAD COMPANY,
*Defendant-Relator.*

(CC 15CV27317; SC S063914)

En Banc

Original proceeding in mandamus.*

Argued and submitted November 10, 2016.

Wendy M. Margolis, Cosgrave Vergeer Kester LLP, Portland, argued the cause and filed the briefs for relator. Also on the brief was Julie A. Smith.

Douglas A. Rossi, Rossi Vucinovich PC, Seattle, argued the cause for adverse party. James K. Vucinovich filed the brief for adverse party. Also on the brief was Paul S. Bovarnick, Rose Senders & Bovarnick LLC, Portland.

Lisa T. Hunt, Law Office of Lisa T. Hunt, Lake Oswego, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Lawrence M. Mann, Alper & Mann, PC, Bethesda, Maryland, filed the brief for *amicus curiae* Academy of Rail Labor Attorneys.

KISTLER, J.

Peremptory writ to issue.

Walters, J., dissented and filed an opinion, in which Brewer, J., joined.

_____

\* On petition for writ of mandamus from an order of Multnomah County Circuit Court, Kenneth R. Walker, Judge.

**KISTLER, J.**

The primary question in this case is whether the Due Process Clause of the Fourteenth Amendment permits Oregon to exercise general jurisdiction over an interstate railroad for claims unrelated to the railroad's activities in this state. The trial court ruled that it could exercise general jurisdiction over the railroad and denied the railroad's motion to dismiss plaintiff's negligence action for lack of personal jurisdiction. After the railroad petitioned for a writ of mandamus, we issued an alternative writ to the trial court, which adhered to its initial ruling. The case accordingly came to us for briefing and argument. We now hold that due process does not permit Oregon courts to exercise general jurisdiction over the railroad.

Plaintiff sustained injuries while working for Union Pacific Railroad Company "as a spiker machine operator near Minidoka, Idaho."[1] According to plaintiff's complaint, the machine that he used to set spikes was in a "state of disrepair," which subjected him to "excessive vibration and jarring." Additionally, Union Pacific's decision to reduce "the spiker machine's customary three-[person] crew to a two-[person] crew" placed greater physical demands on plaintiff, causing or contributing to the injuries he suffered. As a result of Union Pacific's alleged negligent maintenance of the spiker machine and its decision to reduce the number of persons operating that machine, plaintiff suffered economic and noneconomic damages totaling approximately $615,000.

Union Pacific is a Delaware corporation with its principal place of business in Omaha, Nebraska.[2] It currently

---

[1] This mandamus proceeding arises out of plaintiff's negligence action against Union Pacific. We take the facts from the record that was developed in the underlying action on Union Pacific's motion to dismiss for lack of personal jurisdiction. *See Willemsen v. Invacare Corp.*, 352 Or 191, 195 n 2, 282 P3d 867 (2012) (explaining that the record on a motion to dismiss for lack of personal jurisdiction includes the complaint, affidavits, and other evidence that the parties submitted on the motion). We assume, for the purposes of this proceeding, that the facts alleged in plaintiff's complaint are true and construe any disputed facts consistently with the trial court's ruling. *See id.*

[2] Union Pacific's corporate offices are located in Omaha, as are its "rail traffic control headquarters."

operates railroads in 23 states, including Oregon. It has been engaged in business in Oregon on an ongoing basis for a substantial period of time; one of its now-merged subsidiaries first began operating in Oregon in 1863.[3] Oregon also forms a significant part of Union Pacific's business. The company owns approximately 32,000 miles of track in 23 states, with approximately 3.4 percent of those tracks in Oregon. In terms of the amount of track that Union Pacific owns, Oregon is thirteenth among the 23 states. Oregon is ninth in terms of employees and fourteenth among the 23 states in revenues generated.

Plaintiff brought this action in Oregon to recover for injuries that he sustained in Idaho. In response to Union Pacific's motion to dismiss for lack of personal jurisdiction, plaintiff raised essentially two arguments. First, he argued that Oregon has general jurisdiction over Union Pacific under the Federal Employees Liability Act (FELA), 35 Stat 65, as amended, codified as 45 USC sections 51-60. Second, he argued that, apart from FELA, Oregon has general jurisdiction over Union Pacific because Union Pacific's actions in Oregon were "so substantial and of such a nature as to justify suit against [Union Pacific] on causes of actions arising from dealings entirely distinct from those activities." (Quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 US 915, 924, 131 S Ct 2846, 180 L Ed 2d 796 (2011).) On review, plaintiff adds a third argument. He contends that Oregon has specific jurisdiction over Union Pacific in this case. We begin with plaintiff's second argument.[4]

---

[3] The Oregon Steam Navigation Co. began in 1863 as a portage railroad to carry steamship travelers around rapids and falls on the Columbia River. It merged with Oregon Railway & Navigation Co. (OR&N), which became part of a railroad system that Union Pacific leased and that connected to a Union Pacific subsidiary, Oregon Short Line (OSL). Although OR&N and OSL operated as separate corporate entities well into the twentieth century, they merged with Union Pacific in 1987.

[4] Ordinarily, we would begin with the federal statutory issue that plaintiff raises before reaching any constitutional limitation on exercising jurisdiction over Union Pacific. However, plaintiff has not explained how Congress can authorize states to exercise jurisdiction that due process forbids. Moreover, as explained below, the section of FELA on which plaintiff relies does not purport to confer authority on state or federal courts to exercise personal jurisdiction over out-of-state corporate defendants. We accordingly begin with plaintiff's constitutional claim and then turn to his reliance on the federal statute.

## I.   GENERAL JURISDICTION

ORCP 4 L authorizes Oregon courts to exercise personal jurisdiction over out-of-state defendants to the extent permitted by the state and federal constitutions. Union Pacific identifies no state constitutional limit on the trial court's authority to hear plaintiff's claims, and the question accordingly becomes whether due process permits Oregon to exercise general jurisdiction over Union Pacific. In answering that question, we focus initially on the Court's discussion of general jurisdiction in *Daimler AG v. Bauman*, 571 US ___, 134 S Ct 746, 187 L Ed 2d 624 (2014).

The Court held in *Daimler* that California courts could not exercise general jurisdiction over Daimler AG, a German public stock company, to hear claims that were unrelated to that state.[5] 134 S Ct at 762. We discuss *Daimler* in greater detail below. Essentially, however, the Court explained that a corporation will be "at home" in a state and thus subject to general jurisdiction in two paradigmatic places: the corporation's place of incorporation and its principal place of business. *Id.* at 760. Although the Court did not foreclose the possibility that a corporation could be "at home" in other places, it identified a limited set of "exceptional" circumstances that will provide comparable contacts. *Id.* at 761 n 19. In doing so, the Court rejected the argument that plaintiff raises here—that a substantial and continuous business presence within a state is, in and of itself, sufficient to give rise to general jurisdiction over an out-of-state corporate defendant. *Id.* at 761-62.

In reaching those conclusions, the Court began by tracing the development of specific and general jurisdiction. The Court explained that both doctrines find their roots in *International Shoe Co. v. Washington*, 326 US 310, 66 S Ct 154, 90 L Ed 95 (1945). The plaintiff's claim in *International Shoe* arose out of the defendant's contacts with the forum

---

[5] In *Daimler*, employees of Daimler's Argentinean subsidiary sued Daimler in federal district court in California, claiming that Daimler's Argentinean subsidiary had conspired with the security police in that country to kidnap, torture, and kill the subsidiary's employees. Because the plaintiffs' claims had no connection to California, the plaintiffs had to establish that Daimler's presence in California was sufficient to give that state general jurisdiction over it.

state, and the question in that case was whether those in-state contacts were sufficient to give the forum state personal jurisdiction over the defendant. That type of personal jurisdiction, now called specific jurisdiction, turns on "'the relationship among the defendant, the forum, and the litigation.'" *Daimler*, 134 S Ct at 754 (quoting *Shaffer v. Heitner*, 433 US 186, 204, 97 S Ct 2569, 53 L Ed 2d 683 (1977)). That is, specific jurisdiction "depends on an affiliatio[n] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 US at 919 (alteration in original; internal quotation marks omitted).

*International Shoe* also recognized a related but separate category of personal jurisdiction, which has been labeled general jurisdiction. More specifically, *International Shoe* recognized that a foreign corporation's "continuous corporate operations within a state [may be] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." 326 US at 318. The Court did not have occasion in *International Shoe* to determine how substantial an out-of-state corporation's activities within the forum state must be before the forum could exercise general jurisdiction over the corporation. *International Shoe*, as well as most of the Court's subsequent personal jurisdiction cases, have focused instead on specific jurisdiction.

After *International Shoe* and before *Daimler*, only three of the Court's cases had considered when a foreign corporation's contacts with a forum will be sufficient to permit the forum state to exercise general jurisdiction over it. One case held that a Philippine mining company that temporarily had relocated to Ohio during the Second World War was subject to general jurisdiction in Ohio. *See Daimler*, 134 S Ct at 756 (describing *Perkins v. Benguet Mining Co.*, 342 US 437, 72 S Ct 413, 96 L Ed 485 (1952)). As the Court explained in *Daimler*, "[g]iven the wartime circumstances, Ohio could be considered a surrogate for the [mining company's] place of incorporation or head office." *Id*. at 756 n 8 (internal quotation marks omitted); *see also Goodyear*, 564

US at 928 (describing *Perkins* the same way).[6] Each of the other two cases concluded that the out-of-state defendant's occasional contacts with the forum state were insufficient to give that state general jurisdiction. *Goodyear*, 564 US at 929;[7] *Helicopteros Nacionales de Colombia v. Hall*, 466 US 408, 104 S Ct 1868, 80 L Ed 2d 404 (1984).[8]

The Court's decision in *Goodyear* has proved notable not so much for its holding but for its explanation of when a corporation's activities within a forum state will be sufficient to give rise to general jurisdiction. The Court explained in *Goodyear* that "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." 564 US at 919. The Court did not define with any specificity in *Goodyear* when a foreign corporation will be "essentially at home" in the forum state; the contacts in that case were so few that further definition was unnecessary.[9] Rather, the task of defining when a foreign corporation will be "essentially at home" fell to *Daimler*.

---

[6] In *Daimler*, Justice Sotomayor read *Perkins* for the proposition that the displaced company had a substantial presence in Ohio but also maintained extensive operations elsewhere. 134 S Ct at 769-70 n 8 (opinion concurring in the judgment). She accordingly disagreed that Ohio was a surrogate for the company's head office. *Id*. Whatever the merits of that reading of *Perkins*, the Court's interpretation of *Perkins* in *Goodyear* and *Daimler* controls our view of that case.

[7] In *Goodyear*, the Court held that the North Carolina courts lacked general jurisdiction over the European subsidiaries of a United States parent to hear claims against those subsidiaries arising out of an accident in France. The subsidiaries had no presence in North Carolina, and the tires that they manufactured were sold primarily in European and Asian markets. 564 US at 920-21. Only a small percentage of the subsidiaries' tires were distributed in North Carolina by other Goodyear affiliates. *Id*.

[8] In *Helicopteros*, the Court held that Texas lacked general jurisdiction over a Colombian corporation when the corporation's contacts with Texas were confined to "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas-based helicopter company] for substantial sums; and sending personnel to [Texas] for training." *Helicopteros*, 466 US at 416.

[9] In *Goodyear*, the Court explained that a corporation would be "at home" in a state if the corporation were comparable to a domestic enterprise in that state, but it did not provide further guidance. *See* 564 US at 924.

On that issue, there was no dispute in *Daimler* that the German corporation's own activities in California were insufficient to permit that state to exercise general jurisdiction over it. Rather, the plaintiffs' theory (and the Ninth Circuit's holding) turned on the proposition that Mercedes Benz USA (MBUSA), Daimler's United States subsidiary, was Daimler's agent, that MBUSA's in-state activities were attributable to Daimler, and that MBUSA was subject to general jurisdiction in California—a proposition that was undisputed in that case.

In considering that theory, the Court questioned whether, even if MBUSA were Daimler's agent, its activities were attributable to Daimler. *Id.* at 759 (holding out the possibility that MBUSA's activities in California would be attributable to Daimler only if MBUSA were Daimler's alter ego). In a similar vein, the Court questioned whether an agent's contacts with the forum would be attributable to the principal for the purpose of establishing general jurisdiction even though those contacts would be attributable to the principal for the purpose of establishing specific jurisdiction. *Id.* Finally, the Court questioned whether California could exercise general jurisdiction over MBUSA. *See id.* at 758.

The Court concluded, however, that "[e]ven if we were to assume that MBUSA is at home in California, and further to assume MBUSA's contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the state hardly render it at home there." *Id.* at 760. In reaching that conclusion, the Court identified two paradigmatic places where a corporation will be "at home": "the place of incorporation and principal place of business." *Id.* The Court did not "foreclose the possibility that in an exceptional case, *see, e.g., Perkins,*" a corporation could be at home in some place other than its place of incorporation and its principal place of business. *Id.* at 761 n 19. However, the Court rejected the plaintiffs' argument that a corporation will be at home "in every State in which a corporation engages in a substantial, continuous, and systematic course of business"—an argument that the Court described

as "unacceptably grasping." *Id.* at 761 (internal quotation marks omitted).[10]

The Court explained why MBUSA's activities in California—even if they were imputed to Daimler and even if they were sufficient to give rise to general jurisdiction over MBUSA—were not sufficient to establish general jurisdiction over Daimler:

> "[T]he general jurisdiction inquiry does not 'focu[s] solely on the magnitude of the defendant's in-state contacts.' \*\*\* General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States. \*\*\* Nothing in *International Shoe* and its progeny suggests that 'a particular quantum of local activity' should give a State authority over a 'far larger quantum of . . . activity' having no connection to any in-state activity."

*Id.* at 762 n 20 (citation omitted; bracket in original). The Court reasoned that, if MBUSA's California activities gave that state general jurisdiction over Daimler, then every other state in which MBUSA's sales were sizeable could also assert general jurisdiction over Daimler—a result that the Court rejected as an "exorbitant exercis[e] of all purpose jurisdiction." *Id.* at 761.

Given *Daimler*, we conclude that Oregon may not exercise general jurisdiction over Union Pacific. There is no dispute that Union Pacific has engaged in a "substantial, continuous, and systematic course of business" in Oregon. However, Union Pacific's activities in Oregon, while substantial, are only a small part of its larger business activities in 23 states. To paraphrase the Court's reasoning in *Daimler*, if Oregon can exercise general jurisdiction over Union Pacific because that company's activities in this state

---

[10] The Court recognized that a corporation's "continuous and systematic" activities in the forum state will give rise to specific jurisdiction when they "also give rise to the liabilities sued on." 134 S Ct at 761 (quoting *International Shoe*, 326 US at 317). However, as noted, it rejected the plaintiff's argument that systematic and continuous activities in the forum state were sufficient to give rise to general jurisdiction in every state in which those activities occurred.

are substantial and continuous, then every state in which Union Pacific has engaged in similar activities can assert general jurisdiction over it, and the Court was clear that a rule of decision that results in multiple jurisdictions simultaneously asserting general jurisdiction over an out-of-state defendant is at odds with the Due Process Clause.[11]

Plaintiff, however, advances three interrelated reasons why *Daimler* does not foreclose Oregon from exercising general jurisdiction over Union Pacific. He contends initially that the touchstone of *International Shoe* is "fairness" and that there is nothing unfair in subjecting Union Pacific to general jurisdiction in a state, such as Oregon, where it has a substantial and continuous business presence. Second, and perhaps in support of the first point, plaintiff notes that Union Pacific employs 1,700 persons in Oregon, has an annual Oregon payroll of $144.6 million, owns and operates almost 1,100 miles of track throughout the state, and generates over $645 million annually in revenue from its Oregon operations. Finally, plaintiff notes that this case is factually distinguishable from *Daimler*. It does not require attributing the activities of an in-state agent to a foreign corporation to hear a claim that arose in another country, as in *Daimler*. Rather, this case focuses on Union Pacific's activities in Oregon to determine whether that company is subject to general jurisdiction in this state for an injury that resulted from Union Pacific's alleged negligence in a neighboring state.

While we appreciate the distinctions that plaintiff identifies, we are not persuaded that *Daimler* can be distinguished so easily. We agree with plaintiff that, in

---

[11] The Court identified primarily two reasons why "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction." *Daimler*, 134 S Ct at 760. First, the Court explained that, following *International Shoe*, specific jurisdiction has become (and should be) the predominant means by which a state may assert jurisdiction over an out-of-state defendant. General jurisdiction should play only a subsidiary role. *Id.* at 757-58 and n 9. Second, the rules for determining general jurisdiction should provide clear guides to out-of-state defendants, thus "permit[ting] out-of-state defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* at 761-62 (internal quotation marks omitted). The rules that the Court announced for determining general jurisdiction further those goals.

*International Shoe*, the Court invoked fair play as a touchstone of due process. However, since that time, the Court has refined and clarified the rules that guide our determination of when due process permits states to exercise general jurisdiction over out-of-state defendants. We cannot rely on the general invocation of fair play in *International Shoe* to undo the more specific rules for determining general jurisdiction that the Court announced in *Daimler*.[12]

Plaintiff's related point—that Union Pacific is engaged in substantial and continuous business activities in Oregon—does not provide a viable basis for distinguishing *Daimler*. In *Daimler*, the Court explicitly assumed that MBUSA's activities in California could be imputed to Daimler. Those activities included "the presence of multiple offices, the direct distribution of thousands of products accounting for billions of dollars in sales, and continuous interaction with customers" in California. *Id.* at 764 (Sotomayor, J., concurring in the judgment). As the Court explained, however, in response to the concurring opinion, "the general jurisdiction inquiry does not focu[s] solely on the magnitude of the defendant's in-state contacts. * * * General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety." *Id.* at 762 n 20. Similarly, in this case, while Union Pacific's activities in Oregon are substantial, they form only a small part of its activities in the 23 states in which it operates. Viewed through the lens that *Daimler* provided, those contacts are not sufficient to confer general jurisdiction over Union Pacific. If they were, most (if not all) of the states in which Union Pacific operates could exercise general jurisdiction over it. However, as the Court explained, due process does not permit such an "exorbitant exercise" of general jurisdiction.

Finally, plaintiff argues that this case is factually distinguishable from both *Daimler* and *Goodyear*. To be sure, there are differences between the two cases. *Daimler* involved an international corporation, whose ties to

---

[12] Plaintiff has not explained why he could not have brought an action in Idaho where the injury occurred or why it would be unfair, as *International Shoe* used that concept, to limit personal jurisdiction over Union Pacific to the state in which it allegedly caused the injury and those states in which Union Pacific is incorporated and maintains its principal place of business.

California depended on attributing its subsidiary's in-state activities to it. Moreover, the plaintiffs' claims in *Daimler* arose outside of the United States while plaintiff's claims in this case arose in a neighboring state. Perhaps the Court could have relied on those facts in holding that California lacked general jurisdiction over Daimler. It did not do so, however. Rather, the Court expressly assumed that MBUSA's activities in California were attributable to Daimler but found MBUSA's activities in California insufficient in the context of Daimler's larger operations. Nor does the international character of the issues in *Daimler* provide a basis for distinguishing that decision. The Court expressly declined to adopt the rationale advanced by Justice Sotomayor's opinion concurring in the judgment, which turned on the lack of a connection between California and a claim by Argentinean plaintiffs against a German corporation. *Id.* at 762 n 20.[13] However narrowly the Court might have written *Daimler*, we are not persuaded that the decision, as written, can be fairly distinguished.

## II.   SECTION 56 OF FELA

Plaintiff also relies on section 56 of FELA. Congress enacted FELA in 1908 to provide a federal cause of action for injured railroad workers. 35 Stat 65.[14] As initially enacted, FELA left venue to the general federal venue statute, which "fixed the venue of suits in the United States courts, based in whole or in part *** in districts of which the defendant was an inhabitant." *Baltimore & Ohio R. Co. v. Kepner*, 314 US 44, 49, 62 S Ct 6, 86 L Ed 28 (1941). It quickly became apparent, however, that it was an "injustice to an injured employee" to permit the employee to bring an action only in the district where the defendant railroad was an inhabitant.

---

[13] At the end of its opinion, after the majority had concluded that the Ninth Circuit erred in holding that California courts could exercise general jurisdiction over Daimler, the majority noted that the "transnational context of this dispute bears attention," but that context merely confirmed the Court's holding. 134 S Ct at 762. It did not control it. Had it done so, the Court would have agreed with Justice Sotomayor's opinion concurring in the judgment.

[14] As enacted in 1908, FELA focused on substantive issues, such as the standard of care and who can recover in the event of the employee's death; it made railroads liable for their negligence, eliminated the defenses of contributory negligence and assumption of risk, and replaced those defenses with comparative fault. 35 Stat 65-66.

*Id.* Accordingly, in 1910, Congress added what is now codified as section 56 of FELA. That section provided and still provides:

> "Under this chapter an action may be brought in a [District Court of the United States], in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several States, and no case arising under this Act and brought in any state court of competent jurisdiction shall be removed to any court of the United States."

36 Stat 291; *see* 45 USC § 56.

Relying on *Kepner* and *Miles v. Illinois Central R. Co.*, 315 US 698, 62 S Ct 827, 86 L Ed 1129 (1942), plaintiff argues that the Supreme Court "has consistently upheld the jurisdiction of courts in FELA cases even though those [cases were brought] in states different from the location of an injury, or the headquarters or place of incorporation of the defendant railroad." In plaintiff's view, the Court has "consistently done so because of the 'exceptional' nature of interstate railroads," a proposition that plaintiff sees as bringing FELA cases within the class of "exceptional" cases that, under footnote 19 in *Daimler*, will give rise to general jurisdiction in a forum other than a corporate defendant's place of incorporation and primary place of business.

The difficulty with plaintiff's argument is that section 56 of FELA addresses venue and subject matter jurisdiction. It does not address personal jurisdiction. As explained below, the FELA cases on which plaintiff relies apparently assumed (no defendant raised the issue in those cases) that personal jurisdiction over the railroads existed because the railroads were "doing business" in the jurisdiction in which they were sued. That basis for asserting personal jurisdiction over out-of-state corporate defendants predated *Kepner* and *Miles*, was not unique to railroads but applied to all out-of-state corporate defendants, and did not survive *Daimler*. With that preface, we turn to the terms of section 56.

Section 56 consists of two sentences. The first sentence is a venue provision that defines the venues in which FELA claims may be brought in federal district courts. *See Kepner*, 314 US at 50-51 (describing that sentence as conferring venue); Sen R 432 (1910), *printed in* 45 Cong Rec 4040, 4041 (stating that the first sentence in the 1910 amendment pertains to "the venue of such an action"). That sentence provides that claims under FELA can be brought in the federal district courts in three places: the district where the defendant resides, the district where the cause of action arose, or the district where the defendant was doing business when the action was commenced. *Kepner*, 314 US at 50. As the Court recognized in *Kepner*, the first sentence of section 56 does not confer personal jurisdiction over out-of-state corporate defendants but instead provides for expanded venue "'if there is jurisdiction.'" *Id.* at 51 (quoting *Hoffman v. Foraker*, 274 US 21, 23, 47 S Ct 485, 71 L Ed 905 (1927)); *accord Missouri ex rel Southern Railway Co. v. Mayfield*, 340 US 1, 3, 71 S Ct 1, 95 L Ed 3 (1950) (noting personal jurisdiction as a prerequisite to the application of section 56).

Plaintiff fares no better under the second sentence in section 56. That sentence confirms that state courts have concurrent subject matter jurisdiction over federal FELA claims. *Second Employers' Liability Cases*, 223 US 1, 56, 32 S Ct 169, 56 L Ed 327 (1912). The Court explained in *Second Employers' Liability Cases* that, when Congress enacted FELA in 1908, the general jurisdictional provision giving state courts concurrent subject matter jurisdiction over federal claims was sufficient, without more, to establish the state courts' jurisdiction over those claims. *Id.* The second sentence of section 56 was added to emphasize the existence of concurrent subject matter jurisdiction but did not itself confer it. *Id.* That sentence was intended to confirm the authority (and duty) of state courts to hear federal FELA claims "when [the state court's] ordinary jurisdiction as prescribed by its local laws is appropriate to the occasion and is invoked in conformity with those laws, to take cognizance of an action to enforce a right of civil recovery." *Id.* at 56-57; *accord Testa v. Katt*, 330 US 386, 394, 67 S Ct 810, 91 L Ed 967 (1947) (holding that state courts generally may not refuse enforcement of federal claims if state courts would

enforce the same type of state-law claims).[15] Confirming the state courts' concurrent subject matter jurisdiction over federal claims is not the same thing as conferring personal jurisdiction over out-of-state corporate defendants.

Nothing in section 56 purports to confer personal jurisdiction over out-of-state corporate defendants on state or federal courts. It is true, as plaintiff argues, that in *Kepner* the Court upheld the ability of an Ohio plaintiff injured in that state to bring a FELA claim in a New York federal district court when the basis for filing an action in that forum was that the defendant railroad was doing business there. 314 US at 48. The only issue, however, raised in *Kepner* was whether the broad venue provision in the first sentence of section 56 precluded the railroad from asserting a *forum non conveniens* defense. *Id.* at 51. The railroad did not argue and the Court did not address whether a New York court could assert personal jurisdiction over a nonresident corporation for injuries that occurred in another state. A similar pattern occurred in *Miles*, on which plaintiff also relies.

Plainitff concludes from *Kepner* and *Miles* that section 56 of FELA gave the courts in those cases personal jurisdiction over the out-of-state corporate defendants. Not only is that conclusion difficult to draw from the Court's failure to address personal jurisdiction in those cases, but it is also at odds with the history that preceded those cases. *Cf. New York Trust Co. v. Eisner*, 256 US 345, 349, 41 S Ct 506, 65 L Ed 963 (1921) (noting that "a page of history is worth a volume of logic"). As early as 1882, the Court held that a state could assert personal jurisdiction over an out-of-state corporate defendant if the corporation was "doing business" in the state through its agent and the state served the corporate defendant's agent. *St. Clair v. Cox*, 106 US 350, 355-56, 1 S Ct 354, 27 L Ed 222 (1882). The Court reached

---

[15] In explaining the 1910 amendment, Senator Borah stated that, in his view, the sentence was not necessary because the general jurisdictional provision applied. 45 Cong Rec 4034-35 (remarks of Sen Borah). He noted, however, that the Supreme Court of Connecticut "ha[d] refused to take jurisdiction of this class of [FELA] cases, holding that it was the evident intent of Congress to confine this class of cases to the jurisdiction of the federal court." *Id.* at 4035. The second sentence was added to make clear that state courts have concurrent subject matter jurisdiction to hear FELA cases. *Id.*

a similar conclusion in *International Harvester v. Kentucky*, 234 US 579, 34 S Ct 944, 58 L Ed 1479 (1914), even though the corporate defendant in that case had structured its business practices to avoid complying with a state law requiring that an agent be appointed for service of process.[16]

In *Davis v. Farmers Co-Operative Co.*, 262 US 312, 316, 43 S Ct 556, 67 L Ed 996 (1923), the Court cited *International Harvester* for the proposition that the forum state had personal jurisdiction over the defendant railroad because it was doing business there.[17] In light of *Davis*, *International Harvester*, and *St. Clair*, it should come as no surprise that the defendant railroads in *Kepner* and *Miles* did not question whether the forum had personal jurisdiction over them. In both cases, those railroads were doing business in the states in which the FELA actions were brought. Rather, the only question that the defendant railroads raised was whether venue could be transferred to a more convenient forum.[18]

---

[16] There are two related but separate types of "doing business" cases. One arose as a result of state statutes that required out-of-state corporations doing business within a state to appoint a registered agent for the service of process. *St. Clair*, 106 US at 355-56. Although the Court initially stated that personal jurisdiction was limited to the corporation's in-state activities, it later recognized that such statutes could provide for general jurisdiction. *See Pennsylvania Fire Ins. Co. v. Gold Issue Mining Co.*, 243 US 93, 95-96, 37 S Ct 344, 61 L Ed 610 (1917). The other class of cases arose in the absence of such statutes and recognized that a forum state could assert personal jurisdiction over corporations doing business within the state as long as a corporate agent was served with process in the state. *See International Harvester*, 234 US at 585-86 (discussing amount of business activity within a state necessary under the Due Process Clause to justify personal jurisdiction). In this case, plaintiff relies on the latter line of cases, not the former.

[17] Because the courts in which railroads were "doing business" had personal jurisdiction over them, the issue in FELA cases shifted from personal jurisdiction under the Due Process Clause to whether asserting a FELA claim in an unrelated jurisdiction placed an undue burden on interstate commerce in violation of the Commerce Clause. *See Davis*, 262 US at 317. *Davis* held that it did. *Id.* After a series of cases that initially followed but later limited *Davis*, the Court finally confined *Davis* to its "particular facts" in *Kepner*. *See Kepner*, 314 US at 51 n 11.

[18] Plaintiff also relies on a statement that Senator Borah made in introducing the 1910 amendment. After explaining that the first sentence of the amendment "has reference to the venue" of a FELA action, he added that the amendment "enables the plaintiff to find the corporation at any point or place or State where it is actually carrying on business, and there lodge his action, if he chooses to do so." 45 Cong Rec 4034 (1910). Plaintiff's reliance on that statement is misplaced for three reasons. First, Senator Borah specifically focused on venue, not personal

The most that plaintiff can extract from *Kepner* and *Miles* is that the parties in those cases implicitly assumed that the forum states had jurisdiction because the railroads were "doing business" there. And the parties' implicit assumptions will advance plaintiff's jurisdictional arguments only if "doing business" in a forum is enough, without more, to assert general jurisdiction over an out-of-state corporate defendant. As *Daimler* makes clear, however, it is not. As explained above, the Court held in *Daimler* that the fact that an out-of-state corporation "engages in a substantial, continuous, and systematic course of business" in a state is not sufficient, in and of itself, to give that state general jurisdiction over the corporation. *Daimler* also rejected the proposition that "at home," as it used that phrase, is "synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." 134 S Ct at 762 n 20. And the *Daimler* Court observed that, although *Perkins* had relied on two cases upholding "the exercise of general jurisdiction based on the presence of a local office, which signaled that the corporation was 'doing business' in the forum," those "doing business" cases "should not attract heavy reliance today." *Id.* at 761 n 18.

As we read *Daimler*, it concluded that the recognition of specific jurisdiction in *International Shoe* foreclosed reliance on older cases finding general jurisdiction based solely on "doing business" within a forum.[19] We cannot follow

---

jurisdiction. Second, the "doing business" cases provided for personal jurisdiction "where [the railroad was] actually carrying on business." *Id.* Put differently, personal jurisdiction where the railroad was actually carrying on business was a premise not a consequence of the amendment. Third, even if Congress intended to confer personal jurisdiction on state courts where it would not otherwise exist, plaintiff never explains how Congress can do so in violation of the Due Process Clause.

[19] As noted, plaintiff does not argue that Oregon courts can assert personal jurisdiction over Union Pacific based on Oregon's statute requiring out-of-state corporations doing business within this state to appoint agents for service of process. *See* ORS 60.731. We accordingly do not decide in this case whether Oregon's statute purports to confer personal jurisdiction over out-of-state defendants; whether, if it does, it purports to confer jurisdiction only over claims that arise out of a corporation's activities within this state; or whether, if it purports to confer general jurisdiction, Oregon could do so consistently with the federal constitution. It is sufficient in this case to hold that the quantum of business activity necessary to constitute "doing business" under cases such as *International Harvester* is no longer sufficient, in and of itself, to confer general jurisdiction under *Daimler*.

the Court's decision in *Daimler* and give continued effect to the "doing business" cases that plaintiff implicitly urges us to follow, nor can we find in the terms of FELA, the cases interpreting it, or the history that preceded it a basis for saying that cases brought against railroads under that statute constitute an "exceptional" case that, like *Perkins*, will permit a court to exercise general jurisdiction over a corporate defendant in a forum other than its state of incorporation or principal place of business. We accordingly reach a different conclusion from the Montana Supreme Court, which relied on earlier "doing business" cases in upholding general jurisdiction over a railroad. *See Tyrrell v. BNSF Railway Co.*, 373 P3d 1 (Mont 2016), *cert granted*, ___ US ___ (2017). We agree instead with the majority of courts that have held that the fact that a corporation is doing business within a state is not sufficient in and of itself to give that state general jurisdiction over the corporation. *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F3d 619 (2d Cir 2016); *Kipp v. Ski Enterprise Corp.*, 783 F3d 695, 698-99 (7th Cir 2015); *Martinez v. Aero Caribbean*, 764 F3d 1062, 1070 (9th Cir 2014).

## III.   SPECIFIC JURISDICTION

Plaintiff argues that we can affirm the trial court's ruling on an alternative ground—that the relationship among Union Pacific, the forum, and this litigation are sufficient to give Oregon specific jurisdiction over Union Pacific. *See [Outdoor Media Dimensions Inc. v. State of Oregon](#)*, 331 Or 634, 659-60, 20 P3d 180 (2001) (explaining when an appellate court can affirm the lower court's ruling under the "right for the wrong reason" doctrine).[20] Plaintiff did not raise this issue below, and, as he notes, "the factual record

---

[20] In *Outdoor Media Dimensions*, the court explained that an appellate court can affirm a lower court's ruling on a different ground when "certain conditions are met." Among other things,

"if the question presented is not purely one of law, then the evidentiary record must be sufficient to support the proffered alternative basis for affirmance. That requires: (1) that the facts of record be sufficient to support the alternative basis for affirmance; (2) that the trial court's ruling be consistent with the view of the evidence under the alternative basis for affirmance; and (3) that the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below."

331 Or at 659-60.

in regard to specific jurisdiction is not fully developed." We agree. The only Oregon-specific fact before the trial court on Union Pacific's motion to dismiss was plaintiff's residence. The complaint alleged that, at all material times, plaintiff "was a resident of the City of Albany, State of Oregon." Plaintiff does not identify any other evidence in the record that would provide a basis for finding specific jurisdiction over his claim against Union Pacific, nor are we aware of any. Without more, we cannot say that the trial court had specific jurisdiction over Union Pacific.[21] *See Robinson v. Harley-Davidson Motor Co.*, 354 Or 572, 574, 316 P3d 287 (2013) (holding that Oregon courts could not exercise specific jurisdiction over a claim brought by an Oregon resident for injuries sustained elsewhere because "this litigation did not arise out of or relate to [the] defendant's activities in Oregon").

Peremptory writ to issue.

**WALTERS, J.,** dissenting.

Oregon should have authority to adjudicate a FELA claim brought by one of its residents against a railroad that has laid tracks and conducted its unique interstate railway business here for over one hundred years. For the reasons that follow, I would hold that this is one of the "exceptional" cases to which the court referred in *Daimler AG v. Bauman*, 571 US __, 134 S Ct 746, 187 L Ed 2d 624 (2014), and that defendant is "at home" in Oregon and is subject to its general jurisdiction.

In *Daimler*, the United States Supreme Court explained that a corporation will be "at home" in two paradigmatic places: the corporation's place of incorporation and its principal place of business. *Barrett v. Union Pacific Railroad Co.*, 361 Or 115, 122, __ P3d __ (2017); *Daimler*, 134 S Ct at 760. However, the Court did not "foreclose the possibility that[,] in an *exceptional case*," a corporation's operations in another forum could be "so substantial and of such a nature as to render the corporation at home in that

---

[21] We express no opinion on whether plaintiff's failure to develop the issue of specific jurisdiction in the trial court forecloses him from doing so when this case goes back to the trial court. The parties have not briefed that procedural issue in this court, and we leave that issue initially to the trial court.

State." *Daimler*, 134 S Ct at 761 n 19 (emphasis added). This is one of those exceptional cases.

To understand why, it is important to understand the historical bases for state court jurisdiction over railroads and the Court's reasons for circumscribing general jurisdiction in *Daimler*.

Before 1977, corporations, including railroads, were subject to *in rem* jurisdiction, meaning that they could be sued in states in which they owned real property, to the extent of that property. Under that form of jurisdiction, a corporation could be sued in a forum state in which a defendant owned property for wrongful acts that occurred outside the forum state. Thus, in *Pennoyer v. Neff*, 95 US 714, 723-24, 24 L Ed 565 (1877), the Supreme Court explained why the defendant's ownership of property in Oregon provided a sufficient basis for Oregon to exercise judicial power over the defendant:

> "So the State, through its tribunals, may subject property situated within its limits owned by non-residents to the payment of the demand of its own citizens against them; and the exercise of this jurisdiction in no respect infringes upon the sovereignty of the State where the owners are domiciled. Every State owes protection to its own citizens; and, when non-residents deal with them, it is a legitimate and just exercise of authority to hold and appropriate any property owned by such non-residents to satisfy the claims of its citizens. It is in virtue of the State's jurisdiction over the property of the non-resident situated within its limits that its tribunals can inquire into that non-resident's obligations to its own citizens, and the inquiry can then be carried only to the extent necessary to control the disposition of the property. If the non-resident[s] have no property in the State, there is nothing upon which the tribunals can adjudicate."

At the time of *Pennoyer*, it was the forum state's relationship to the defendant and the defendant's property, and not the nature of the plaintiff's claims, that determined jurisdiction. Thus, what later was referred to as "general jurisdiction" was the basis on which all jurisdiction was justified. Mary Twitchell, *The Myth of General Jurisdiction*, 101 Harv L Rev 610, 614-15 (1988).

That understanding of jurisdiction was the prevailing understanding when Congress enacted FELA in 1908 to provide a federal cause of action for injured workers. 361 Or at 126 (discussing legislative history of FELA). In 1910, Congress amended FELA to add what is now codified as section 56, which provides, in part:

> "Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several States."

45 USC § 56 (1908).

Senator William Borah of Idaho, who delivered Senate Report Number 432, H.R. 17263, 61st Congress, Second Session, 45th Congressional Record 4034 (1910), explained the intent of that amendment as "enabl[ing] the [p]laintiff to find a corporation at any point or place or state where it is actually carrying on business and there lodge his action if he chooses to do so." Senator Borah stated that, in his view, the second sentence of that provision was not necessary because the general jurisdictional provisions applied. 45 Cong Rec 4034-35. From the text of that provision and Senator Borah's statement, it appears that Congress intended to grant FELA plaintiffs the right to sue for injury in any state in which a railroad does business and to grant state courts personal jurisdiction over such railroads.

The majority understands the intent of Congress more narrowly. It reads FELA as giving state courts concurrent subject matter jurisdiction to hear FELA claims and as specifying the venues in which such claims may be heard. I am not sure that that is correct. As explained, at the time that FELA was enacted, state courts had unquestioned jurisdiction to adjudicate state law personal injury claims and to impose liability against railroads that owned and operated facilities within their states. In enacting FELA, Congress may well have intended to grant state courts the same jurisdictional reach when adjudicating FELA claims.

But, even if the majority is correct and FELA does not grant personal jurisdiction, it at least assumes it. Venue cannot lie where jurisdiction does not exist, and FELA reflects a congressional assumption that state courts will have personal jurisdiction over railroads that own and operate facilities in their states.

Two United States Supreme Court cases that the majority discusses also reflect that assumption. In *Miles v. Illinois Central R. Co.*, 315 US 698, 62 S Ct 827, 86 L Ed 1129 (1942), and *Baltimore & Ohio R. Co. v. Kepner*, 314 US 44, 49, 62 S Ct 6, 86 L Ed 28 (1941), the plaintiffs did not bring actions in the states where they resided and where the railroads that injured them owned tracks. Instead, the plaintiffs brought actions in other, distant states, and the defendant railroads argued that requiring them to defend there placed a burden on interstate commerce and resulted in inequity, vexatiousness, and harassment. *Miles*, 315 US at 700; *Kepner*, 314 US at 47. In both cases, the Court held against the carriers and refused to enjoin the distant actions to proceed. *Miles*, 315 US at 705; *Kepner*, 314 US at 54. In doing so, the Court assumed, rather than decided, that the distant courts had jurisdiction over the railroads because the railroads were doing business there. But an even more basic assumption, shared by all the parties, was that the one undisputed place that the plaintiffs surely could bring their claims was in the states in which they resided and in which the railroads owned tracks. *See Morris v. Missouri Pac. R. Co.*, 107 Neb 788, 187 NW 130 (1922) (plaintiff resident of forum state brought claim against defendant railroad in state where railroad owned tracks but that was not its place of incorporation or principal place of business); *Hoogbruin v. Atchison, T. & S. F. Ry. Co.*, 213 Cal 582, 2 P2d 992 (1931) (same).

It was not until 1977, when the Court decided S*haffer v. Heitner*, 433 US 186, 97 S Ct 2569, 53 L Ed 2d 683 (1977), that principles of Due Process limited the exercise of *in rem* jurisdiction based on a defendant's ownership of property within a state. In S*haffer*, the Court held that the Due Process Clause precludes the exercise of state authority in the absence of the minimum contacts required by

*International Shoe Co. v. Washington*, 326 US 310, 66 S Ct 154, 90 L Ed 95 (1945). *Shaffer*, 433 US at 207.[1]

In 2011, the Court placed additional limits on a state's exercise of general jurisdiction when it held that state authority does not extend to actions against foreign corporations unless their affiliations with a forum state are "so continuous and systematic as to render them essentially at home in the forum state." *Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 US 915, 131 S Ct 2846, 2853, 180 L Ed 2d 796 (2011). And, in 2014, in *Daimler*, the Court concluded that the defendant's affiliations with California did not meet that test: California did not have general jurisdiction in a case arising from the torture and killing of workers in Argentina brought against a German corporation whose only connection with California was that its wholly-owned foreign subsidiary regularly sold cars there. 134 S Ct at 751.

Thus, from 1877, when *Pennoyer* was decided, until at least 2014, when *Daimler* was decided, state courts had undisputed jurisdiction to protect their residents from injuries inflicted by railroads that owned tracks and conducted substantial business within their borders. The facts in *Daimler* do not compel a different result here; the question is whether the Court's reasoning necessarily does so.

In *Daimler*, the Court gave four reasons for holding that California did not have jurisdiction over the defendant corporation. First, the Court reviewed its decision in *Goodyear* and affirmed that it had "declined to stretch general jurisdiction beyond limits traditionally recognized." *Id.* at 757-58. Second, the Court described the paradigm fora for the exercise of general jurisdiction over a corporation as the corporation's place of incorporation and principal place of business. *Id.* at 760. The Court observed that those places have the twin virtues of being unique and easily ascertainable. *Id.* Third, the Court rejected as "unacceptably grasping" the plaintiffs' suggestion that a corporation is at home in every state in which it "engages in substantial,

---

[1] Applying those principles in *Shaffer*, the Court concluded that jurisdiction could not be premised on the defendants' stock ownership in the forum state; defendants' stock ownership did not constitute sufficient minimum contacts. 433 US at 216.

continuous, and systematic course of business." *Id*. at 761. The Court explained that "[i]f Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which [it's subsidiary's] sales are sizeable." *Id*. That, the Court reasoned, would "scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id*. at 762 (quoting *Burger King Corp. v. Rudzewicz*, 471 US 462, 472, 105 S Ct 2174, 85 L Ed 2d 528 (1985)). Fourth, the Court noted that a more expansive view of general jurisdiction would pose risks to international comity; other nations do not share the "uninhibited approach to personal jurisdiction" that the plaintiffs' view represented. *Id*. at 763.

None of those reasons raise concerns about Oregon's assertion of authority here. First, permitting Oregon to exercise authority to decide this case does not "stretch general jurisdiction beyond limits traditionally recognized." *Id*. at 757-58. Rather, it gives effect to state jurisdictional reach that has long been assumed and exercised. It is true that, in *Daimler*, the Court cautioned that its decisions from the era of "*Pennoyer*'s territorial thinking," basing jurisdiction only on the presence of local offices in the forum state, "should not attract heavy reliance today." *Id*. at 761 n 18. However, although the Court cautioned against *heavy* reliance on those cases, it did not jettison them entirely. I cite *Pennoyer* and its description of the reasons for recognizing state authority not as determinative, but as demonstrative: It would be far more novel to *preclude* Oregon from exercising jurisdiction in this case than it would be to *permit* it.

Second, recognizing general jurisdiction in states in which interstate railroads lay tracks may be fairer to those railroads and more easily ascertainable than recognizing general jurisdiction in states in which railroads are incorporated or have their principal place of business would be. Here, for example, defendant is far more "at home" in the 23 states in which it owns tracks and conducts business than it is in Delaware, the state in which it is incorporated, but in which it does not own tracks or conduct any business. And it may be easier to ascertain the states in which a railroad

lays tracks than to ascertain the one state that constitutes its "principal place of business." Here, for example, defendant takes the position that its principal place of business is in Nebraska, but it owns more tracks and employs more people in Texas. In *Daimler*, the Supreme Court cited *Hertz Corp. v. Friend*, 559 US 77, 92-93, 130 S Ct 1181, 175 L Ed 2d 1029 (2010), as providing a predictable rule for determining the "principal place of business" of a defendant. *Daimler*, 134 S Ct at 760. But that rule, used for determining diversity, requires consideration of "where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp.*, 559 US at 92-93. For an interstate railroad, that factual inquiry could prove more complex than a determination of the states in which the railroad has laid down tracks.

Third, permitting Oregon to exercise its sovereign authority here would not require application of the test that the Court rejected in *Daimler* as "unacceptably grasping," 134 S Ct at 761, nor would it offend "traditional notions of fair play and substantial justice," *International Shoe*, 326 US at 316 (internal quotation marks omitted) (explaining application of Due Process Clause). I do not advocate for jurisdiction in Oregon because, as the plaintiffs argued in *Daimler*, defendant railroad "engages in substantial, continuous, and systematic course of business" here. 134 S Ct at 761. Although it is true that, in Oregon, defendant railroad employs 1,619 employees with an annual payroll of $244.6 million; recently generated in excess of $645 million in annual revenue; made capital expenditures in excess of $81 million; and made purchases in excess of $116 million, it is not the size of defendant's Oregon operations on which I rely. I rely, instead, on Oregon's right to protect one of its residents from harm done by a corporation with a permanent, physical presence here, that is, by its nature, unique.

Traversing this state with permanent tracks, defendant railroad is "at home" here in ways that other businesses are not. Defendant railroad owns and operates almost 1,100 miles of track in Oregon. It operates switching yards and locomotive facilities in Portland; operates a classification yard in Hinkle; and considers La Grande an important

operation and crew change point. By its very nature, a railroad requires such an extensive, physical presence.

What is more, an interstate railroad requires an extensive, physical presence in more than one state. The purpose of such a railroad is not to do business in one state or primarily in one state; its purpose is to connect the business interests in a number of states, and it is physically structured to do so. When an interstate railroad lays its tracks in and between states, it moves into each of those states in an obvious, physical way, and is as much "at home" in each one of those states as it is in any other. That does not mean, however, that interstate railroads are not able "'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* at 762 (quoting *Burger King Corp.*, 471 US at 472). Interstate railroads move into states with careful deliberation and with a great deal of governmental oversight.

Congress regulates interstate railroads at the federal level and preempts state regulation of the construction, operation, and abandonment of rail lines. *See* 49 USCA § 10101-11908 (1995); *Emerson v. Kansas City Southern Ry. Co.*, 503 F3d 1126 (2007). And when railroad workers are injured, Congress provides them with a federal cause of action that is uniformly applied throughout the nation. 45 USC § 56 (1908); *see Dice v. Akron, C. & Y. R. Co.*, 342 US 359, 361, 72 S Ct 312, 96 L Ed 398 (1952) ("[O]nly if federal law controls can the federal Act be given that uniform application throughout the country essential to effectuate its purposes."). There is nothing "unacceptably grasping" or unfair about requiring that interstate railroads that have notice that they are subject to suit in all states in which they do business answer FELA claims in those states.

Finally, giving effect to congressional intent and Oregon sovereignty in this exceptional circumstance would raise no international comity concerns. It would be rare for a multinational corporation to own tracks or operate railroads in the United States or in Oregon, and if it did, it would do so with notice of FELA's jurisdictional reach. Allowing Oregon to assert personal jurisdiction here would not permit all states in the union to assert jurisdiction over this railroad

or extend Oregon's jurisdiction in all instances in which a foreign business operates or has a physical presence here. Rather, allowing Oregon to proceed in this case would stand only for the proposition that the business of this railroad is "so substantial and of such a nature as to render [it] at home in [this] State." *Daimler*, 134 S Ct at 761 n 19.

The general jurisdictional opening that the Court preserved in *Daimler* may be slim, but the principles of dual sovereignty at play here should permit these plaintiffs to step through. Congress has an interest in protecting interstate railroad employees from harm and in permitting them to bring federal FELA claims in all states in which such a railroad does business. Oregon has an interest in protecting its residents from harm inflicted by railroads that own tracks traversing its lands. This is one of the "exceptional" circumstances in which defendant is essentially "at home" in Oregon, even though it is not incorporated and does not have its principal place of business here. To deny Oregon the right to exercise its sovereign authority here would be to deny its traditional exercise of its sovereign powers. I respectfully dissent.

Brewer, J., joins in this dissenting opinion.